RENDERED: AUGUST 14, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0126-MR

SHAWN HOLLINGSWORTH, JR.                            APPELLANT

V.

ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE OLU A. STEVENS, JUDGE
NO. 19-CR-001966

COMMONWEALTH OF KENTUCKY                        APPELLEE

**OPINION OF THE COURT BY JUSTICE THOMPSON**

**<u>AFFIRMING</u>**

After a jury trial, Shawn Hollingsworth was convicted of the murder of R.O. and the first-degree assault of S.H. but acquitted of the murder of J.M.[1] Hollingsworth received a life sentence from the Jefferson Circuit Court. Hollingsworth argues a variety of trial errors on direct appeal, but the most important among them concerns the propriety of allowing a lay witness to testify regarding the location of Hollingsworth's cell phone based on which cell phone towers were carrying its signals. Such testimony involved the investigating officer producing the technical data provided by cell phone carriers and translating the data, explaining what the data represented and presenting maps created based on the data. This testimony was significant as it

---

[1] The names of the victims, all of whom were minors at the time of these shootings, are represented by their initials to protect their identities.

corroborated S.H.'s testimony about where she, R.O., J.M. and Hollingsworth traveled together that night.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Late in the evening of June 23, 2019, the minors J.M. and R.O. were shot and killed. Another minor, S.H., was also shot but survived her wounds. Much of the narrative account of what occurred that evening was provided by the testimony of the female minor S.H.'s testimony as she was the only person to survive the shootings. Hollingsworth did not testify.

Earlier on June 23, 2019, Hollingsworth sent J.M. a number of electronic messages proposing and discussing the planned burglary of a home that Hollingsworth had selected. According to S.H., she picked up J.M, R.O., and Hollingsworth and for the next five hours the group drove to several spots around Louisville while J.M. and Hollingsworth discussed robbing the house chosen by Hollingsworth which the group then visited but did not enter because it was occupied. The group later arrived at an apartment complex in Louisville at 10:30 p.m. at which point Hollingsworth and J.M. exited the vehicle to gamble with dice on Seelbach Avenue, which is a nearby alley. S.H. stayed in the car while R.O slept in the backseat. Later, J.M. called S.H. on her cell and asked her to drive to the alley entrance for Parthenia Avenue, on the other side of the apartment complex. Upon arriving, S.H. heard two gunshots.

S.H. testified Hollingsworth next appeared out of the alley and entered S.H.'s vehicle directing her to drive to the end of Parthenia Avenue and informing her that police were chasing J.M. At the end of Parthenia Avenue,

2

Hollingsworth exited the vehicle and walked to Seelbach Avenue where he looked down the alley and gave a "thumbs-up" to S.H. Hollingsworth then returned to the car where he shot both S.H. and R.O. R.O. died immediately. After a period of unconsciousness, S.H. drove to her home where she informed her mother and stepsister that Hollingsworth had shot her and R.O. before S.H. was transported to University of Louisville Hospital (UofL Hospital).

J.M. was discovered wounded and unconscious in the alley by a passerby and transported to UofL Hospital where he was pronounced dead at 12:00 a.m. on June 24, 2019. Hollingsworth was indicted for the murders of J.M. and R.O. as well as first-degree assault for the shooting of S.H.

A jury convicted Hollingsworth for the murder of R.O. and the first-degree assault of S.H. The jury acquitted Hollingsworth of a second murder charge related to the death of J.M. which was not witnessed by S.H. The jury recommended a life sentence for the murder conviction and a consecutive twenty-year sentence for the first-degree assault conviction. The trial court reduced Hollingsworth's sentence to life in prison.

Hollingsworth appeals from his convictions and sentence as a matter of right to this Court. *See* Ky. Const. § 110. Hollingsworth argues trial court errors regarding: (1) allowing a detective to offer what he alleges to have been impermissible expert testimony regarding the results of cell phone mapping he performed; (2) failure to strike sixteen prospective jurors for cause; (3) failure to remove two jurors who believed they may have been photographed by someone

3

in the gallery; and (4) allowing the Commonwealth to introduce a call between Hollingsworth and his father while Hollingsworth was in jail.

Finding no error, we affirm.

## II. ANALYSIS

### A. Did the Trial Court Err in Permitting a Detective's Testimony, as a Non-Expert, Regarding the Mapping of Cell Phone Location Data?

A portion of the evidence presented in the prosecution of Hollingsworth dealt with the general location of the cell phones used by J.M and Hollingsworth on the night of the shootings. In his appeal, Hollingsworth makes a broad attack on the Commonwealth's use of Call Detail Records (often referred to simply as "CDR") evidence which was presented at trial by Detective Timothy O'Daniel who worked in the Louisville Metro Police Department's Digital Forensics Unit. Hollingsworth argues that Detective O'Daniel improperly "provided expert opinion testimony while narrating" his presentation of cell tower location data, improperly testified that victim J.M.'s phone was "most likely moving" when it connected to different cell phone towers, and the Commonwealth did not "sufficiently disclose the basis for this testimony" in accordance with Kentucky Rules of Criminal Procedure (RCr) 7.24(1)(c).[2]

---

[2] RCr 7.24(1)(c) states:

Upon written request by the defense, the attorney for the Commonwealth shall furnish to the defendant a written summary of any expert testimony that the Commonwealth intends to introduce at trial. This summary must identify the witness and describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

4

In this matter, Detective O'Daniel obtained cell phone records (here, CDR) for both J.M.'s phone and the phone attributed to Hollingsworth from cell phone providers. The CDR analyzed here is one type of evidentiary material which falls under the umbrella of Cell-Site Location Information (CSLI). CDR are "historic" records that cell phone companies keep which include data points that are helpful in determining a broad general area where a cell phone was previously located. CDR include and "detail" what cell towers those phones previously were connecting with during a specified period of time. From this raw data, investigators can determine, within some range of error, a cell phone's location at a particular time or over a period of time. There is a "range of error" found in using this information which includes the fact that a cell phone may not, at certain times, connect to the cell tower to which it is closest, uncertainty as to the exact range of a tower, and the "shape" of the area to which it provides coverage given the directional attributes of certain towers.

In *Holbrook v. Commonwealth,* 525 S.W.3d 73, (Ky. 2017), this Court explained the relationship of cell phones to cell towers:

> Cell phones work by communicating with cell-sites operated by cell-phone service providers. Each cell-site operates at a certain location and covers a certain range of distance. The geographic area covered by a particular tower depends upon the number of antennas operating on the cell site, the height of the antennas, topography of the surrounding land, and obstructions (both natural and manmade). When a cell phone user makes a call, the phone generally connect[s] to the cell site with the strongest signal, although adjoining cell towers provide some overlap in coverage. As a cell phone user moves from place to place, the cell phone automatically switches to the tower that provides the best reception. Due to practical and technical necessity, cell-phone service providers keep historical records of which cell-sites each of their users' cell phones have communicated. Review of a cell

5

tower's location data does not identify a cell phone user's location with pinpoint precision—it identifies the cell tower that routed the user's call. Historical cell-site data makes it possible to identify at least the general location of a cell phone at the time the phone connects to a tower. A cell user's location may be further defined by the sector of a given cell tower which relays the cell user's signal, the user may be anywhere in that sector.

*Id.* at 79 (internal quotations and citations omitted).

[C]ell phones are essentially radios, as they use radio signals to contact cell towers. Each tower is unique and has identifiers that allow cell providers to determine what specific tower a phone communicated with during the logged activity. Most cell towers are engineered to cover a 360-degree radius which is typically broken down into three sectors. When a user makes a phone call, the cell phone connects to the tower and sector with the strongest signal, which is often, but not always, the closest tower to the caller. Through reviewing cell phone records, which reflect which tower a phone connects to at a specific date and time, [the investigator] could determine the general location of a phone at a particular time. By determining the cell phone tower and sector, [the investigator] can identify a general area or "footprint" within which the phone was located at a given time.

*Id.* at 80.

Well prior to trial, on February 27, 2020, the Commonwealth began producing phone record data to the defense and filed a supplemental response to the trial court's pretrial order of discovery which listed J.M.'s and S.H.'s phone records and J.M.'s "CDR mapping." On March 4, 2022, Hollingsworth filed a request with the Commonwealth for expert disclosures of any expert witnesses expected to testify on behalf of the Commonwealth pursuant to RCr 7.24(1)(c).

On April 19, 2022, the Commonwealth produced additional discovery to Hollingsworth which included what it termed was "CDR Mapping." In response

6

to that disclosure, on April 29, 2022, Hollingsworth filed a motion to continue his trial, then scheduled for May 10, 2022, due to the Commonwealth's late[3] tender of discovery which included "new Call Detail Record (CDR) Mapping of (S.H.'s) phone and CDR Records of Shawn Hollingsworth." The Commonwealth agreed to a continuance and both parties agreed to a new trial date beginning July 12, 2022.

On June 15, 2022, Hollingworth filed a renewed notice for expert disclosure related to digital forensics. At the court's motion hour on June 20, 2022, the Commonwealth stated it was "not sure that any of (our) witnesses are expert witnesses when it comes to the cell phones." On June 28, 2022, the Commonwealth filed a supplemental response to discovery providing a "[w]orksheet and demonstrative maps based on previously provided Call Detail Records" and "a power point that Detective O'Daniel" would present to the jury. It was Detective O'Daniel who the Commonwealth stated would be called to "testify to historical cell-tower data regarding the towers with which defendant's phone was communicating on or about June 23, 2019." The supplemental disclosure stated it was the Commonwealth's position that the detective was not an expert within the meaning of RCr 7.24(1)(c) but "out of an abundance of caution, and in compliance with RCr 7.24(1)(c), a copy of Detective O'Daniel's *curriculum vitae*" was attached.

---

[3] Jefferson Circuit Court Rules of Practice (JRP) 803 require that the Commonwealth fulfill its discovery obligation "no later than ten (10) days prior to the first pretrial." In this matter, the final pretrial had occurred on February 23, 2022.

On July 6, 2022, Hollingsworth filed reciprocal discovery identifying Dr. Michael Littrell as an expert who was "still in the process of examining the records provided" by the Commonwealth but would testify "generally to the use and investigation of historical cell site location analysis" including "the Call Detail Records (CDR) provided by the Commonwealth and how mobile devices communicate with Cell Sites."

On July 12, 2022, the first day of Hollingsworth's now-scheduled trial, Hollingsworth filed a motion *in limine* seeking to exclude Detective O'Daniel's alleged "expert testimony" arguing that Detective O'Daniel's potential testimony would be "more than just 'coordinates on a map,'" and the maps he had produced "seem to necessarily include information about the use and operation of cell towers generally, cell site azimuth[4] and their potential directionality, and the coverages areas of the cell sites." The motion also argued that the maps contained "information from a program called 'Trax,'" provided to law enforcement that was not commercially available and "includes data points that are also not available to the general public."

On July 12, 2022, both parties announced ready for trial, but due to unrelated issues they agreed to reschedule the trial to begin on October 25, 2022. Hollingsworth's motion *in limine* was not addressed by the trial court at that time and Hollingsworth did not request a hearing on the motion prior to trial.

---

[4] An azimuth is the direction an antenna is pointed in degrees where zero is north. With a cell site sector, the azimuth represents the center point of the sector's coverage.

When Hollingsworth's trial proceeded on October 25, 2022, the parties selected the jury before taking up Hollingsworth's motion *in limine*. Hollingsworth argued that Detective O'Daniel would be testifying as an expert because he would be presenting "more than just coordinates" and would be providing "other testimony about how cell phone towers, phones, work." Detective O'Daniel's "expertise" could be gleaned from his *curriculum vitae* which showed his work with the LMPD's Digital Forensics Unit and over 200 hours of specialized digital analysis training including three separate 40 hour courses in "Criminal Investigations Using Cellular Technologies," "Subject Matter Expert Course for Call Detail Records and Geolocation Analysis," and "Forensic Analysis of Cellular Networks." Further, Hollingsworth argued his testimony would not fall under "lay testimony" because his maps were not created with a widely available computing tool but were generated using "Trax," a computer program that Hollingsworth's expert could not access since it was a tool available only to law enforcement.

While Hollingsworth argued that Detective O'Daniel had "expertise" and should have been formally declared as an expert witness, Hollingsworth did not request a *Daubert*[5] hearing to question either Detective O'Daniel's qualifications or the reliability of the "principle and methods" he utilized pursuant to Kentucky Rules of Evidence (KRE) 702.

---

[5] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), requires the trial court to play the role of "gatekeeper" to prevent the admission of "unreliable pseudoscientific evidence." *Miller v. Eldridge,* 146 S.W.3d 909, 914 (Ky. 2004).

In response to Hollingsworth's motion, the Commonwealth quoted from our opinion in *Torrence v. Commonwealth*, 603 S.W.3d 214 (Ky. 2020), arguing that Detective O'Daniel's testimony and presentation would not fall under the auspices of "expert testimony" and explained that Trax only creates an "expedited map" correlating cell phone data independently obtained by, and then uploaded by, an investigator with the location and coverage areas of towers known and catalogued by Trax, and that the map ultimately utilized is from a Google Earth program. The Commonwealth also represented that the maps created by Detective O'Daniel could have been plotted by him manually, by hand, without using the "shortcut" of Trax, stating that the recreation of the Trax-produced mapping was otherwise "doable just time consuming."

The trial court took the matter under submission. On the third day of the trial, prior to Detective O'Daniel being called to testify, the trial court overruled Hollingsworth's motion *in limine* and in doing so noted, that Detective O'Daniel "would also qualify as an expert if needed."

When Detective O'Daniel testified at trial, he explained that his department had obtained CDR from the cell phone provider, which showed cell phone usage corresponding to various cell towers. Those cell phone records relating to Hollingsworth and S.H.'s cell phones were displayed with Detective O'Daniel explaining how he read the records to determine which cell towers were used by which cell phone numbers at various times during the evening of the murders. Detective O'Daniel also provided narration for the presentation of the mapping he had generated which gave the general area of the two cell

10

phone numbers he reviewed based on the CDR obtained. This presentation showed which cell towers the mapped cell phone numbers connected to and the coverage area of those towers at different points of time on the night of the shootings.

### 1. Standard of Review

We review a trial court's evidentiary rulings under an abuse of discretion standard. *Deal v. Commonwealth*, 607 S.W.3d 652, 657 (Ky. 2020). A trial court abuses its discretion when its ruling was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). However, even if the trial court's ruling is determined to have been erroneous, we will not disturb the jury's verdict where this Court can determine the error was harmless and can "say with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth*, 283 S.W.3d 678, 688-89 (Ky. 2009).

In the realm of expert testimony, "the consideration of reliability [by a trial court] entails an 'assessment into the validity of the reasoning and methodology upon which the expert testimony is based.'" *Toyota Mot. Corp. v. Gregory*, 136 S.W.3d 25, 39 (Ky. 2004) (quoting *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 578 (Ky. 2000)). A trial court's determination regarding the reliability of expert testimony is a finding of fact that we review for clear error. *Miller*, 146 S.W.3d at 915.

11

Hollingsworth's arguments implicate *both* the extent to which Detective O'Daniel could testify as a lay witness *and* the methodology he applied in creating his CDR-based mapping exhibits.

### 2. Kentucky Precedent Regarding Acceptance of Historical Cell Tower Data Evidence

In 2017, this Court noted "the 'science is well understood'" regarding historical CDR data analysis of cell phone and cell tower records and "'the technique [of cell phone location analysis] has been subjected to publication and peer criticism, if not peer review.'" *Holbrook*, 525 S.W.3d at 82 (quoting *United States v. Hill*, 818 F.3d 289, 298 (7th Cir. 2016)). We, like the *Hill* Court, also noted that caution was warranted in the introduction of such material, namely identifying "the level of precision—or imprecision—with which that particular evidence pinpoints a person's location at a given time." *Holbrook*, 525 S.W.3d at 82. We recognized that such data "does not identify a cell phone user's location with pinpoint precision—it identifies the cell tower that routed the user's call." *Id.* at 79 (quoting *United States v. Davis*, 785 F.3d 498, 515 (11th Cir. 2015)).

To avoid any future intermingling of industry-specific terminology in our opinions, there are two other types of CSLI in addition to CDR, which are not discussed in this appeal. These are: (a) GPS/Wi-Fi data, *see, e.g.*, *United States v. Jimenez-Chaidez*, 96 F.4th 1257, 1268 n.4 (9th Cir. 2024); *United States v. Reynolds*, 86 F.4th 332, 342–43 (6th Cir. 2023) (*Reynolds II*); and (b) Real-Time Tool (RTT) data, which is the data that cell phone companies use in the ordinary course of business to create a reliable network for users. RTT shows

the approximate distance between a cell phone and an antenna, calculated by the time it takes for a "ping" from a cell phone to reach the antenna and return to the cell phone "based on the propagation speed of [radiofrequency] waves." *Reynolds II,* 86 F.4th at 343.[6]

In *Holbrook,* unlike in Hollingsworth's case, the witness was qualified by the trial court as an expert in analyzing and mapping historic cell phone data after it conducted a pretrial *Daubert* hearing to both assess the FBI Special Agent's qualifications *and* examine his analysis and opinions relating to historical cell-site data. *Holbrook,* 525 S.W.3d at 79-80. We reviewed the trial court's findings under KRE 702 which provides:

> If scientific, technical, or other *specialized knowledge* will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data;
>
> (2) The testimony is the product of reliable principle and methods; and
>
> (3) The witness has applied the principles and methods reliably to the facts of the case.

(Emphasis added).

---

[6] In *Commonwealth v. Reed,* 647 S.W.3d 237, 241–42 (Ky. 2022), we discussed the difference between "real-time" and "historic" CSLI noting that "real-time CSLI is not a passive location record [like the "historic" stored data utilized in Hollingsworth's case] but data generated by an affirmative action—a "ping"—taken by the cell-service provider at the behest of a law enforcement officer. By "pinging" an individual's cell phone, the cell-service provider is able to determine, instantaneously, the cell phone's [current] location in relation to the available cell sites and to communicate that location information to law enforcement.

KRE 702 was itself written in light of guidance set forth by the United States Supreme Court in *Daubert*, and looks not only to the reliability of the "principles and methods" (KRE 702(2)) behind witnesses' opinions, but *also* the aptitude and acumen of the witnesses themselves to apply their specialized knowledge appropriately (KRE 702(3)) to reach their conclusions.

### 3. Lay Witness vs. Expert Witness Testimony

In 2020, this Court went a step beyond the general acceptance of the science of historic cell tower data methodology and determined that investigators could offer *limited* testimony, as lay witnesses, on the subject without the need to qualify as an expert. In *Torrence v. Commonwealth*, 603 S.W.3d 214 (Ky. 2020), prior to trial, Torrence moved for disclosure of expert testimony by the Commonwealth and made a companion motion to exclude any testimony regarding historical cell tower evidence pursuant to RCr 7.24 (Discovery and Inspection). Both motions were denied by the trial court. Similar to the present case, the defendant did *not* request a *Daubert* hearing challenging the utilization or methodology of historical cell tower evidence.

This Court agreed in *Torrence* that the detective was properly allowed to testify as a lay witness and provide mapping based on cell tower historic data reports explaining:

> [The witness] used the AT&T report to locate and mark tower latitude and longitude points on a Google map. The Commonwealth asserts anyone could read the records, open a Google Maps program on a computer, enter the addresses, locations, or coordinates including latitude and longitude, and obtain the same results. In summary, that meant [the witness's] testimony qualified as lay testimony. We agree.

14

603 S.W3d at 225.

In *Torrence*, the Commonwealth's witness explained to the jury how he obtained the cell phone records, what the records detailed for each call, and applied the information from the records to a map program. *Id.* at 226. We also noted that "[t]he defense can cross examine the witness as to the reports and underlying data as well as contest the maps. The defense can call expert witnesses that arrive at different conclusions based on the same data[.]" *Id.* at 227-28. However, we emphasized that "this new rule with respect to the use of lay testimony to present historical cell-tower data is limited in its application" and further explained:

> Our holding today is that lay testimony may be used to present historical cell-tower data *so long as the testimony does not go beyond simply marking coordinates on a map. If the witness seeks to offer an opinion about inferences that may be drawn from that information, that witness must be presented as an expert witness under KRE 702* (for example, if a witness seeks to provide an opinion as to the location of the cell phone during the relevant time based on the plotted coordinates).

*Id.* at 228 (emphasis added).

The question, therefore, is when exactly does a CDR witness need to be disclosed as an expert and, if there is a *Daubert* challenge to that witness's expertise, be approved by the trial court *or* when may such testimony be accepted as lay witness, non-expert, testimony as we approved in *Torrence*. This issue involves the tension between KRE 701(c)[7] (lay witness testimony)

---

[7] KRE 701 reads:

If the witness is *not testifying as an expert*, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are: (a) Rationally based on the perception of the witness; (b)

15

and KRE 702 (testimony based on "specialized knowledge") and requires courts to assess when a witness's testimony crosses a threshold and evinces such "specialized knowledge" as to necessitate pretrial disclosure and potentially prompt *Daubert* review of either the witness and/or the methodology they employed.

### 4. Specialists in Mapping Call Detail Records

Starting with the personnel who we are seeing in these appeals, the most recent witnesses offering such testimony are now generally specialists, highly trained in the field, who in many cases now possess—and whose testimony evidences—the "knowledge, skill, experience, training, or education" necessary to be qualified as experts under KRE 702. In this case, Detective O'Daniel worked within LMPD's specialized Digital Forensics Unit and the trial court noted on the record that his *curriculum vitae* set forth "at least 240 hours of training" in the fields of cell phone mapping, digital investigative methods, call detail record review, and geolocation analysis.

Drawing on such training, witnesses like Detective O'Daniel could now offer more than just "simple mapping" of the raw CDR we discussed and approved as coming from laymen in *Torrence*. These witnesses can now offer juries more information on the technology itself, how the collected data can be used, and its accuracy and limitations.

---

Helpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and (c) Not based on scientific, technical, *or other specialized knowledge within the scope of Rule 702.*
(Emphasis added).

For example, Detective O'Daniel was able to explain to the jury that while the raw CDR was able to show a cell phone number pairing with a cell tower (which he referred to as "cell sites") at a certain time, he was also able to utilize additional law enforcement tools to narrow and refine the area where the cell phone had been located. Detective O'Daniel explained he had access to the locations of each relevant cell tower either through the CDR data or through the National Domestic Communications Assistance Center (NDCAC), a law enforcement database maintained by the United State Department of Justice (DOJ) and the FBI which can provide precise cell tower locations for mapping purposes when those locations are not included in the CDR provided by the cell phone companies. Also, while the overall or general coverage areas of the cell towers might be more generally known, the software utilized by law enforcement can create mappings which reduces a rough coverage area circle down to a third of its circumference. While not always the case, most cell towers are divided into three sectors, each covering a 120-degree "slice" of the overall coverage area "pie." This approach narrows the cell phone's location from the entire circle of the tower's coverage area to one of the three sector/slices. Here, for each call that was mapped, Detective O'Daniel provided: (a) the time of the call; (b) the phone number of the mapped cell phone; (c) whether the call was "placed" or "received; (d) the number of the other phone that placed the call to, or received the call from, the mapped phone; (e) the duration of the call; (f) the cell tower that was utilized for the call; and (g) the sector of that cell tower's coverage area that was utilized. Detective O'Daniel

17

explained his mapping as showing what he referred to as a "horizontal plane" and that each of the three sectors of each tower's coverage area were divided at 0 degrees, 120 degrees, and 240 degrees (a circle being 360 degrees).

Such testimony obviously drew upon "specialized knowledge" not held by laymen.

Detective O'Daniel also testified Sprint's cell tower data "can be a little off sometimes" due to Sprint's records often showing a prior cell tower location for a call when the phone had actually moved to a second, later, location. While, fortunately, the accuracy of Sprint's data or any mapping resulting therefrom is not an issue in this case, such an opinion obviously draws on training and experience not held by laymen.

Hollingsworth also argues that in one instance Detective O'Daniel's testimony exceeded the scope of testimony allowed concerning CDR data's "precision" when he acknowledged an inference (a cell phone moving between locations over time) that could be drawn from the data and its mapping. On direct, Detective O'Daniel was asked "What is happening here?" while narrating his mapped cell tower data from victim J.M.'s phone and responded by stating that the mapping indicated a "cellular device, um, most likely, uh, moving from the, this area of, of the scene to the area of the hospital." There was no contemporaneous objection made by Hollingsworth to what he now describes as "implicit expert opinion."

In this instance though, Detective O'Daniel's testimony was based upon the mapping of the area where J.M. was first found and mapping of later

18

occurring CDR showing J.M.'s phone connecting to several different towers on the map on a path leading to UofL Hospital. There was, and is, no factual dispute as to the location where J.M. was found, when he was found, or of the fact that he was transported to UofL Hospital. None of this testimony placed Hollingsworth at or near the scene of any of the crimes as it only concerned J.M.'s possible locations after he was found wounded. Moreover, this was common sense testimony insofar as it is clear that a cellphone likely moved when it pinged one cell tower and then later pinged on another tower. This is not so technical that a jury could not understand the all too obvious inference without expert proof just as one would not expect the necessity of expert testimony to prove that a piece of mail moved when it was once at a post office and then later appeared in a mailbox. Lastly, Hollingsworth was acquitted of J.M.'s murder and could not therefore have been prejudiced by testimony which did nothing more than confirm J.M.'s known movements.

Considering his testimony as a whole, Detective O'Daniel's testimony appears to fall between our classic notions of highly trained expert witnesses who are permitted to offer conclusive opinions on matters that could not otherwise be sufficiently comprehended by juries, and non-experts who would still be allowed to offer more generalized opinions on matters with which they are familiar or have observed. If Kentucky followed Indiana's lead, witnesses with specialized knowledge and training like Detective O'Daniel would most appropriately be classified as "skilled witnesses" situated between laymen and experts as we noted in *Torrence*.

19

A skilled witness, by contrast, is a person with "a degree of knowledge short of that sufficient to be declared an expert under [Indiana Evidence] Rule 702, but somewhat beyond that possessed by the ordinary jurors." A skilled witness, then, will "perceive more information from the same set of facts and circumstances than an unskilled witness would." The skilled witness may give an opinion "(a) rationally based on the witness's perception; and (b) helpful to a clear understanding of the witness's testimony or to a determination of a fact in issue."

603 S.W.3d at 227 (quoting *Zanders v. State*, 73 N.E.3d 178, 188 (Ind. 2017)).

Counsel and our trial courts must remain vigilant in monitoring when a witness who has only been disclosed as a "layman" attempts to offer testimony which enters the realm of expert testimony based on technical or other specialized knowledge. In such instances, our disclosure rules and the *Daubert* standard come into play and this type of explanatory testimony could violate the prohibition found in KRE 701(c) against lay witnesses testifying on matters "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." The Evidence Rules Review Commission Notes regarding KRE 701 indicate that subsection (c) was specifically intended to combat the possibility of counsel avoiding the reliability standards set out in *Daubert* "by the simple process of offering . . . 'scientific, technical, or other specialized knowledge' evidence through a witness that an attorney sought to identify as a 'lay witness.'"

### 5. Advances in CDR Mapping Technology

Trained investigators like Detective O'Daniel now utilize, and rely upon, programs like Trax to generate maps based on the CDR data they have

20

obtained and now have additional resources available to them like NDCAC, discussed above, which allow them to fill in information not contained in CDR data. These technological advancements invite renewed *Daubert* analysis by our Courts.

Detective O'Daniel appropriately limited his presentation to not show precise locations of any of the mapped cell phones but only showed the sector of coverage, designated by Trax, corresponding to each call routed through each tower's location. In this case, Detective O'Daniel stated he only used Trax as "a shortcut" to manually mapping the raw data and as a means of identifying the location of one cell tower whose coordinates were not contained in the raw data received from the service provider. Hollingsworth's expert noted the one tower's location was missing from the CDR produced by the provider, but we can find no prejudice to Hollingsworth given his expert acknowledged during cross examination that the tower's coordinates were available but that he did not contact the provider himself to inquire. Otherwise, Hollingsworth's expert's mapping did not vary in any observably significant manner from that provided by Detective O'Daniel.

In this case however, Hollingsworth did not assert a *Daubert* challenge, in name or in substance, questioning the reliability of Trax or NDCAC as evidentiary tools to the extent they were utilized by Detective O'Daniel. To date, neither the use nor reliability of Trax or NDCAC has been specifically analyzed in Kentucky and we make no decision within this opinion regarding their efficacy under KRE 702.

21

### 6. The Trial Court Did Not Err in Allowing Detective O'Daniel's Testimony

On the narrow issue of Detective O'Daniel's training, the specifics of his training were disclosed in his *curriculum vitae* and supported the trial court's determination that Detective O'Daniel would qualify as an expert in this field as necessary. This Court has not otherwise been shown any reason to doubt that pronouncement and the trial court did not abuse its discretion in its determination.

Furthermore, Detective O'Daniel's opinions and mapping were tendered sufficiently in advance of trial to allow for review by Hollingsworth's own expert and preparation of cross-examination by his counsel. Neither the quality of Detective O'Daniel's training nor the results of his mapping techniques were brought into question by Hollingsworth.

Despite having retained and declared his own CDR expert, Hollingsworth's motion to the trial court did not contain any affidavit or supporting report describing how the Commonwealth had prejudiced him by not specifically identifying Detective O'Daniel as an expert despite providing his *curriculum vitae*, or more importantly, what necessary *additional* information, data or opinions the Commonwealth should have provided to Hollingsworth about Detective O'Daniel in addition to that which it had tendered in discovery.

As to Detective O'Daniel's opinions, the information, data, and mapping the Commonwealth provided in discovery prior to trial were wholly sufficient to give Hollingsworth, his counsel and his own expert, the knowledge of Detective O'Daniel's utilization of Trax and the results of, and conclusions to be drawn

from, his mapping. The information provided was utilized effectively by Hollingsworth in his cross examination of Detective O'Daniel and was reflected in the testimony of his own expert. We are not otherwise persuaded that the totality of Detective O'Daniel's disclosures would not have been in accord with RCr 7.24(1)(c) had that, in fact, been the issue before the trial court.

Most importantly, as noted above, Hollingsworth raised no *Daubert* challenge whatsoever to Detective O'Daniel's methodology or to Trax or NDCAC as reliable technologies to the extent utilized by Detective O'Daniel. The use of such database "shortcuts" to mapping raw data, when the accuracy of their results is not questioned and their utilization is rather simplistic, does not fundamentally change the basic concepts of CDR mapping as addressed in *Torrence*, nor does it create a situation in which CDR mapping is rendered so highly technical that expert proof is required.

For these reasons, we observe no error or an abuse of discretion in the trial court's determination to allow Detective O'Daniel testify, nor do we observe any indication that the CDR mapping methodology he relied upon, or the results of his mapping, were unreliable as we previously explained in *Holbrook*.

We find that there was no cause for the trial court to impose a higher level of scrutiny than that set forth in our precedent. Hollingsworth fails to establish that the trial court's decision to allow the testimony was an abuse of discretion or arbitrary, unreasonable, or unsupported by sound legal principles. *English*, 993 S.W2d at 945. In fact, the trial court's determination

23

was solidly based on our current jurisprudence as established in *Holbrook* and *Torrence*.

### 7. Judicial Safeguards for Call Detail Record Witnesses and Evidence

Moving forward, when law enforcement agencies determine to subpoena or execute a warrant for CDR from cell service providers, the materials obtained must be made available to the defendants after they are charged or promptly disclosed to the defendants once they are indicted.

Given the nature of CSLI data in its raw form, defendants and their counsel need sufficient time to review the data independently and, if it is determined to be helpful to the defense, engage their own expert to independently review and/or map the information.

The continuing and increasing advances in this technological arena together with the requisite training and experience necessary to appropriately utilize this technology, requires continuing scrutiny to ensure the accuracy of the proof offered by the Commonwealth as well as ensure fundamental fairness to the defendant.

Disclosure of a CDR mapping witness's identity and qualifications must go "hand in hand" with the production of their summaries which should mirror the requirements of RCr 7.24(1)(c). Trial courts must be mindful that such disclosures cannot be withheld but must be tendered in a timely manner giving consideration to a defendant's own needs to review and potentially challenge either the findings factually, via their own expert, or foundationally via a *Daubert* challenge to the methodology used by the proposed witness, or the

underlying technology utilized by the witness. These summaries must include acknowledgment and identification of *any* portions of their opinions which were founded, in whole or in part, upon information created by or provided by programs, databases, or other technologies or entities which was not taken directly from the source data provided by the cell phone companies.

Once such production is completed, only then will defendants be able to determine whether to file a *Daubert* challenge pursuant to KRE 702 as to either the qualifications of the Commonwealth's witness or the reliability of the technology or methodologies utilized. In turn the trial court can properly and effectively "function as a 'gatekeeper'" charged with excluding "unreliable, pseudoscientific evidence," and "assess the reliability of the expert testimony . . . and then evaluate its relevance." *Miller*, 146 S.W.3d at 913-14.

**B.    Did the Trial Court Commit Reversible Error by Not Striking Jurors Who May Have Heard a Deputy's Inappropriate Comments?**

Hollingsworth also argues that the trial court committed reversible error when it did not strike, for cause, sixteen potential jurors who may have heard statements made by a deputy sheriff outside the courtroom but did not report the comments to the trial court. Five of those sixteen prospective jurors ultimately served on Hollingsworth's jury. Hollingworth argues that the court's failure to strike all sixteen prospective jurors constituted an error which violated his right to a fair and impartial jury.

25

Specifically, during *voir dire*, a prospective juror (identified as juror 3050621) approached the bench and with both attorneys present the following discussion occurred:

> Juror: I don't know if I should have brought this up sooner. I don't know if it's a big deal or not, but it's been kind of weighing on me before we came in here for the first time earlier, and we were and we were standing outside the courtroom, the sheriff said to the group, and he was joking, but I don't know if somebody may have taken him literally, he said, "If you want to sit on this jury, sit there and don't say anything. Don't give them a reason to strike you."

> Trial Judge: Who said that?

> Juror: The sheriff.

The Jefferson County Sheriff was not shepherding or monitoring the jury. Here, the juror was obviously referring to a deputy sheriff serving as a bailiff assisting either the trial court or the Circuit Clerk during jury selections. Whoever the deputy sheriff was, that person's identity is not in the record and neither the parties nor the trial court called the deputy to testify regarding the juror's allegation. Ultimately, the trial court stated, "Well, I'm sure he meant it as a joke, but I appreciate you coming up, number one. Number two, I agree with your interpretation, because . . . or at least that it could have been misinterpreted as a joke, I'm sorry that it was said. But I appreciate you bringing it to my attention."

Later during this bench conference, the trial court invited Hollingsworth's counsel to question the prospective juror who described where and when the statement was made by the deputy and reported that she had

26

not spoken to anyone else about the incident. Three other jurors later came forward after the panel was again asked if there were matters any juror "wish[ed] to discuss or anything that has come to their attention," but those issues were unrelated to the deputy's comments. Hollingsworth's counsel brought up the deputy's statements again to the trial court and stated that while she believed the statements were "tongue-in-cheek," she had concerns and the juror's report "gave [her] pause." Counsel expressed her belief that there was a "need to address" what had been said but did not know how to determine whether or not the deputy's remarks had impacted anyone on the panel and did not "have an answer for how to handle that right now." The trial court advised that the juror had explained how the jurors took the deputy's statement, did not share any concerns, and did not want to "go into it any further."

After the panel was released for lunch, the Commonwealth and Hollingsworth's counsel began jury selection and Hollingsworth's counsel moved to strike, for cause, sixteen other jurors who were in proximity to the deputy when he made the statement and may have heard the deputy's statement but had not spoken up themselves to disclose the statement earlier during *voir dire*. This motion was overruled but the trial court allowed counsel to submit into the record a list of the sixteen jurors' numbers who counsel believed should be stricken. The record reveals no explanation as to how Hollingsworth's counsel identified those sixteen jurors as being in proximity to the deputy when he made the alleged statement.

27

When the full jury panel returned to the courtroom, the trial court again queried the potential jurors about whether there was anything they felt they needed to say but had not. Again, another juror approached on a topic unrelated to the deputy's remarks. The trial court next randomly selected fourteen jurors from the remaining pool of eligible jurors. Of the fourteen selected, five had been listed by Hollingsworth's counsel as being among the sixteen potential jurors who may have heard the deputy's remarks but had not reported them.

The Sixth Amendment to the United States Constitution, and Sections 7 and 11 of the Kentucky Constitution guarantee the right to an impartial jury. Mindful of those principles, we review the trial court's decisions under an abuse of discretion standard, "whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English,* 993 S.W.2d at 945.

Regarding implications of juror bias, RCr 9.36(1) states, in pertinent part: "When there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." We have clarified however, that "[t]he decision whether to excuse a juror for bias lies within the sound discretion of the trial court[,]" and "[t]his Court reviews a trial court's determination regarding the exclusion of a juror for cause for an abuse of discretion" judged from the "totality of the circumstances" including "the entirety of the [jurors'] responses and demeanor." *Clay v. Commonwealth,* 291 S.W.3d 210, 216 (Ky. 2009).

28

"The party alleging bias bears the burden of proving that bias and resulting prejudice" and Hollingsworth has failed to prove either. *Id.* at 216. Hollingsworth's counsel did not ask for either an admonition or further questioning by the trial court and did not herself ask any further questions of the venire or direct any further questions towards any individual members thereof concerning the deputy's remarks. While the trial court determined not to personally "go into it any further" with the jury pool, the trial court did not preclude Hollingsworth's counsel from doing so.

To the extent that Hollingsworth's argument implicates juror mendacity by the failure on the part of any other juror to inform the trial court of what they had heard, assuming they had heard it and assuming they believed they should tell the trial court, in order "[t]o obtain a new trial because of juror mendacity, 'a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause.'" *Adkins v. Commonwealth,* 96 S.W.3d 779, 796 (Ky. 2003) (quoting *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 556 (1984)).

Hollingsworth makes no such showing here. This Court cannot entertain a wholly unsupported intimation that any of the five jurors who were chosen for Hollingsworth's jury "followed" the deputy's remarks as an instruction and remained silent in an effort to be seated on the jury in order to convict Hollingsworth. If the deputy did make the alleged statement, a more reasonable conclusion is that the jurors either did not hear the deputy, did not pay

29

attention to the deputy, or did not believe any question actually posed to them during *voir dire* required them to inform the court of the comments.

After review of the totality of circumstances in the record and the *voir dire* as a whole, it was not unreasonable for the trial court to have determined the jurors possessed the impartiality and forthrightness required to sit on the jury. If the alleged remarks were actually made by a deputy, it is obvious that those remarks were improper, but both the juror who informed the trial court and the trial court itself perceived them to have been spoken in jest and there is simply no evidence to support an implication of juror bias or mendacity on the part of any juror. We therefore conclude the trial court did not abuse its discretion.

**C.      Did the Trial Court Err by Not Removing Two Jurors Who Believed They May Have been Photographed from the Gallery During Trial?**

Hollingsworth raises another issue regarding the jury, arguing that two seated jurors should have been removed for cause pursuant to RCr 9.36(1) because they reported they believed someone in the gallery may have photographed them during the trial. While RCr 9.36(1) speaks to prospective jurors, the same standard found therein applies when considering the necessity of removing a seated juror for cause during the course of a trial. *Jerome v. Commonwealth*, 653 S.W.3d 81, 90 (Ky. 2022). This issue is preserved since after the trial court questioned both jurors, Hollingsworth's counsel moved to have them designated as alternate jurors and have them dismissed after closing arguments. Hollingsworth argues that the possible photographing and the jurors' responses "to this supposed incident created

30

reasonable grounds to conclude that they could not be fair and impartial jurors." After review of this incident and the trial court's response, we disagree.

"A trial court's decision whether to remove a juror from a panel that has already been seated is reviewed for an abuse of discretion." *Id.* at 88. A trial court does not abuse its discretion by retaining a seated juror who "state[s] under oath that he ha[s] no feeling in the case either way and kn[ows] of nothing to prevent him from giving both parties a fair and impartial trial." *Rowe v. Commonwealth*, 394 S.W.2d 751, 753 (Ky 1965).

One of the two jurors initially reported her suspicion to a deputy who informed the trial court. In response to questioning by the trial court, the juror stated she thought they may have been photographed on the next to last day of the trial, but had not said anything until the next morning "because I couldn't stop thinking about it while I was in the shower," "I didn't know if it was like, they were trying to intimidate me, uh pictures were being taking of the jury, I didn't know," and "it just scared me."

During the discussion, the trial court specifically asked the juror whether this incident "impact[s] your ability to sit on this case and serve as a fair and impartial juror?" The juror responded that the incident would not.

The second juror was likewise questioned by the trial court and was even less apprehensive, responding: "It really didn't bother me, but you know, now that I think about it, but I'm still not concerned about it at all."

On appeal, this Court will not jump to an assumption of bias on the part of a juror based on the evidence presented here. The record in this case reflects

31

a trial court concerned from the outset with a courtroom containing observers from "both sides of the aisle" representing family and friends of both the victims and Hollingsworth. The trial court knowingly and wisely observed that it did not want "anybody thinking anybody in here or anybody knows anybody to come in here and do something that's going to influence this trial, 'Oh, if I do this, then the trial's going to be off because [Hollingsworth's counsel] is going to make some motions.' It's not."

Given the totality of the circumstances presented here, we conclude there was no abuse of the trial court's discretion and no showing of demonstrable prejudice to Hollingsworth.

**D.    Did the Trial Court Err by Allowing the Commonwealth to Hear a Call Recorded at the Jail between Hollingsworth and his Father?**

Hollingsworth's last argument is that the court erred in admitting, over his objection, a recorded jail call between Hollingsworth and his father. Hollingsworth, who did not testify at trial, argues that the recording was inadmissible hearsay under KRE 802 and could not have been admitted as an adopted admission, an exception to our hearsay rule found in KRE 801A(b)(2), because Hollingsworth's responses during the phone call did rise to the level of adopting his father's statements.

On appeal, "[w]e will not disturb a trial court's decision to admit evidence absent an abuse of discretion." *Matthews v. Commonwealth,* 163 S.W.3d 11, 19 (Ky. 2005). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire and Rubber Co. v. Thompson,* 11 S.W.3d 575, 581 (Ky. 2000).

Here, the phone call between Hollingsworth and his father contained the following exchanges which are relevant to our inquiry:

Father: I heard they caught you

Hollingsworth: Yeah, they did

Father: Can't run forever, you know.

Hollingsworth: Yes sir.

Father: You can't run forever, though . . . *Now you gotta deal with it* and you know, you're going to be alright. You know when you get in there you just need to pray, you know what I'm saying?

Hollingsworth: Yes.

. . . .

Father: You'll be all right, [unintelligible] you gotta stay strong, man, you know, *you gotta realize what you did wasn't right, Shawn,* you know what I'm saying?

Hollingsworth: Yes sir.

Father: So you know, I don't know [unintelligible] talk about too much what's going on, just [unintelligible] let me know when you go to court, and whatever, I'll come to court, I'll be in court. You know what I'm saying?

. . . .

Father: You know, like I told you, you're always gonna be my son. I love you, but what I tell you, end of the day, *when you do grown man things, you have to . . . like a grown man*

Hollingsworth: Yes, sir.

(Emphasis of significant statements added).

The Commonwealth argues that Hollingworth's response to his father's statements constituted an "adoption" of those statements while Hollingsworth

asserts that his responses only indicated his respectful acknowledgment of hearing what his father had said.

The Kentucky Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." KRE 801. One exception to the rule excluding hearsay statements concerns those which indicate adoption of the statements. Under KRE 801A(b)(2), "[a] statement is not [however] excluded by the hearsay rule, even though the declarant is available as a witness, if the statement is offered against a party and is: [a] statement of which the party has manifested an adoption or belief in its truth[.]"

Hollingsworth's agreement with the statement, "you gotta realize what you did wasn't right," could appear to be an adoption of an incriminating statement but, in the full context of the phone conversation, it was one of twelve times Hollingsworth responded with either "yes" or "yes, sir" to statements made by his father and could be a simple acknowledgement by Hollingsworth of having heard his father, instead of necessarily agreeing with him that Hollingsworth had done something wrong.

This Court has previously determined "[w]hen incriminating statements are made in the presence of an accused under circumstances that would normally call for his denial of the statements, and it is clear that the accused understood the statements, yet did not contradict them, the statements are admissible as tacit, or adoptive, admissions." *Marshall v. Commonwealth*, 60 S.W.3d 513, 521 (Ky. 2001).

34

We also note that the call was preceded by an automated warning that it was not privileged and "subject to recording and monitoring." Hollingsworth was well aware and well-warned that law enforcement could not only listen to his calls but that they could be played later for a jury.

The trial court was correct in determining that the jury should be allowed to hear the call and decide for itself whether or not Hollingsworth's father's statements implicated his son's guilt, and whether Hollingsworth's responses indicated, or did not at all indicate, an adoption of his father's statements. This was not error.

### III. CONCLUSION

We affirm Hollingsworth's convictions and sentences by the Jefferson Circuit Court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Joshua M. Reho
Assistant Public Defender


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Bryan D. Morrow
Assistant Attorney General

Shawn D. Chapman
Assistant Attorney General